**DORF INTERNATIONAL, INC., et al.**

v.

**UNITED STATES.**

**A.R.D. 245; Reappraisements R65/5868, R65/5875.**

United States Customs Court,
First Division, Appellate Term.
Oct. 24, 1968.

Sharretts, Paley, Carter & Blauvelt, New York City (Howard C. Carter, New York City, of counsel), for appellants.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for appellee.

Before WATSON, MALETZ and NEWMAN, Judges.

MALETZ, Judge:

This is an application by plaintiffs below for review of a decision and judgment of a single judge (Judge Richardson) sitting in reappraisement sustaining the appraised values of certain importations. Dorf International, Inc., et al. v. United States, 58 Cust.Ct. 634, R.D. 11278 (1967). Involved is the dutiable status of two bottle labelling machines which were manufactured in and exported from Canada by Universal Labelling Machines, Ltd. (Universal). The machines were entered at Detroit, Michigan, at the manufacturer's list

prices less a trade discount of 16 percent and 15 percent, respectively. They were appraised by the government appraiser on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)) [1] —which value was determined to be the manufacturer's list prices. Appellants do not dispute that export value is the proper basis of appraisement but claim that such value is the list price less 15 percent.[2] Their principal contention before the trial court was that the record established (i) that the relationship between the importer and the manufacturer-exporter was that of buyer and seller, and (ii) that the importer had purchased the machines in question from the manufacturer at the latter's list prices less 15 percent. The trial court concluded, however, that the relationship between the two was not that of buyer-seller but rather that the importer was a selling agent of the manufacturer. Accordingly, the court held that plaintiffs had failed to rebut the presumption of correctness attaching to the appraisement of the machines. Appellants insist that this conclusion is erroneous. We affirm the decision below.

There is no real dispute as to the essential facts concerning the principal issue in the case—whether the importer was a buyer of the machines in question or was the manufacturer's agent. Universal, a Canadian corporation, is the sole manufacturer in Canada of the machines in question—which were exported in

1. Section 402(b) of the Tariff Act of 1930, as thus amended, reads:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and

coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.
The articles do not appear on the Final List, T.D. 54521.

2. Prior to January 1, 1963, the exporter allowed the importer a "discount" of 15 percent from the list price which was increased after that date to 16 percent. Plaintiffs' counsel stated at trial that even though 16 percent was actually allowed for the machines in question, only 15 percent was being claimed.

January 1963 and May 1963. Package Machinery Company (Package)—the importer—is a Massachusetts corporation which has no 'stock or intercorporate relationship with Universal. In or about 1959, Universal and Package entered into an oral agreement which was reduced to writing on December 31, 1962. Since the resolution of the controversy depends primarily on the construction of this agreement, we consider its provisions in some detail. It recites at the outset that "Package is desirous of acquiring the right to take orders for and to purchase the products [3] for resale in the 48 states of the United States * * * lying between Canada and Mexico and including the District of Columbia (hereinafter referred to as the 'territory')." Paragraph 1 provides that Package is to have "the exclusive right to take orders for and to purchase the products for resale within the territory." That paragraph also requires Package to "use * * * its best efforts to promote the interests of Universal and to secure for Universal the goodwill of all * * * firms * * * purchasing or contemplating the purchase of the products." Package is further required by paragraph 1 (a) to report to Universal all complaints which come to the attention of Package concerning the products; (b) to maintain places of business as at present throughout the territory to which users of and potential customers of the products shall have ready access; and (c) to render service to the products acquired by the purchasers (whether such products are new or not), with Package allowed the right, however, on its own account and for its own use, to make reasonable charges to such purchasers for such services rendered. In addition, Package is obligated to promote the sale of the products and secure all possible purchasers, and is prohibited from directly or indirectly promoting the sales of or repre-senting manufacturers or distributors of machines in any way competitive with the products without the written consent of Universal.

Paragraph 2 requires Package to "comply with all reasonable sales policies and regulations of Universal in connection with the promotion and sale of the products as may be communicated to Package by Universal from time to time to the extent that such sales policies and regulations do not unreasonably conflict with the established sales policies of Package nor with normal business practices in the United States."

Paragraphs 3 and 4 provide that each party is an independent contractor and is to be solely responsible for all expenses incurred by it in the operation of its business. They further prohibit either party from obligating or making any contract on behalf of the other without first securing the latter's written direction.

Paragraph 5 affords Universal the privilege at all times of sending its own salesmen or other representatives into the territory to promote the sale of the products, with such activity by Universal's salesmen to be at Universal's own expense. The paragraph further specifies that any sales resulting from such activity shall be made by and through Package.

Paragraph 6 provides that Universal shall sell to Package and Package shall purchase from Universal the products at such prices (payable in U. S. currency) as shall be communicated by Universal to Package from time to time. These prices are to be Universal's usual sales prices, f. o. b. Toronto, less 15 percent, unless a lesser percentage is specified elsewhere in the agreement.[4] Package is to have no liability to Universal with respect to the purchase of any product unless and until Package delivers to Uni-

---

3. The term "products" is defined to cover the machines, attachments and parts manufactured by Universal.

4. In the event orders are taken outside the territory for products to be used in the territory, the percentage is to be changed to 10 percent. If orders are taken outside the territory for products to be used outside the territory, the percentage is to be 5 percent. (Pars. 10–11)

versal its duly authorized purchase order therefor. "Shipment of products by Universal shall be as instructed by each such purchase order issued to Universal by Package. If any such purchase order requires the prepayment of any transportation charges, Package shall forthwith reimburse Universal for the amount thereof."

Paragraph 7 specifies that "The prices charged by Package to its customers * * * shall be fixed by Package with the approval of Universal but in no case shall be less than Universal's usual sales prices thereof."

Paragraph 8 provides that "No order for products from a customer of Package shall be accepted by Package until such order has been approved of, in writing, by Universal." [5]

Paragraph 9 reads as follows: "For all products purchased by it from Universal, Package shall, within forty-five * * * days from the date of shipment thereof by Universal, pay the price therefor as provided herein, minus any amounts which may be due Package from Universal pursuant to the terms of this agreement.[6] Package may defer payment to Universal for any product so long as any substantial doubt exists as to the satisfactory performance of the equipment."

Paragraph 12 concerns the matter of spare parts. It requires Package to purchase from Universal all spare parts for any of the products which are within the territory and to pay therefor Universal's usual sale price thereof, f. o. b. Toronto, less 10 percent. Any orders for spare parts which may be received by Universal from customers for any of the products which are within the territory are to be referred to Package. In either case orders for spare parts shall be filled by Universal only after receipt of Package's purchase order in the same manner as provided in paragraph 6 for the

machines themselves. "However, if Universal receives a direct order for spare parts for any of the products which are within the territory from a customer within the territory, and the requirement of such customer appears to be in the nature of an emergency requiring immediate shipment as to which Universal shall be the sole judge, and Package has not previously instructed Universal not to ship to that particular customer, Universal may make immediate shipment, so advising Package, and Package shall thereafter issue to Universal its confirming purchasing order."

"To allow Universal to be conversant with the sales program of Package and the activities of its salesmen with respect to the products," paragraph 13 requires Package to supply to Universal (1) true copies of all orders received or quotations made by Package for the products; (2) particulars of quotas and sales figures; and (3) estimates of sales for areas within the territory.

Finally, paragraph 14 states that Package intends to make the same warranties and representations in respect to the sale of products pursuant to this agreement as Package makes to its customers on machines of its own manufacture. Universal agrees to give Package and its customers the same warranties and representations in regard to the products, and to indemnify and save Package harmless from any liability by reason of giving such warranties and representations to customers in respect to the products.

Further details concerning the arrangement between the parties were supplied by the evidence at trial. That evidence established the following: During the period in issue, Package sold the machines at the list prices established by Universal and Universal allowed Package a so-called discount of 16 percent from such list prices on the

---

5. This paragraph does not apply to orders for spare parts required for use in connection with products previously delivered to Package's customers.

6. Under the prior oral agreement, Package was allowed 30 days from the date of shipment by Universal to pay the latter the specified price.

machines thus sold.[7] In addition, in order to implement paragraph 8 of the agreement—which (as set out above) provided that no order from a customer of Package was to be accepted by Package until approved by Universal—Package in each case forwarded to Universal a "Request For Purchase" which set forth the name and address of the customer, a description of the machine, and the total price "less 15% [or 16%]." If the "Request For Purchase" was approved by Universal, Package issued an appropriate "Purchase Order" and the machine was then shipped by Universal directly to the customer. In all cases, Package was responsible for the payment for the machine within 45 days after the machine was shipped from the Universal plant whether or not Package had received payment from its customer. Thus Package assumed the credit risk; it also paid the cost of transportation from the plant to the port of importation, selected the customhouse broker, and deposited the estimated customs duties.

The evidence also showed that during the period from 1959 to 1964, Universal sold six machines directly to a customer in the United States at the manufacturer's list price without the intervention of Package, which direct sale was made because of the good relationship Universal had with that customer. Because of its agreement with Universal, Package was allowed a 15 percent "discount" on the sale. Finally the evidence disclosed that in accordance with the rights granted by paragraph 5 of the agreement, Universal sent sales representatives into the United States who offered the machines to ultimate users. In each instance, sales resulting from the activity of Universal's representatives went through Package which issued the usual purchase order and received its usual "discount."

■ We come now to the legal principles involved. It is of course basic that the decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him. E. g., Smith v. Cities Service Oil Co., 346 F.2d 349, 352 (7th Cir. 1965); Wasilowski v. Park Bridge Corp., 156 F.2d 612 (2d Cir. 1946); Esmond Mills v. C.I.R., 132 F.2d 753, 755 (1st Cir. 1943), cert. denied 319 U.S. 770, 63 S.Ct. 1432, 87 L.Ed. 1718. Which of these relationships exists is to be determined by the substance of the transaction—not by the labels the parties attach to it. E.g., Mechem On Agency (2d ed.) § 47. No single factor is determinative; rather, the relationship is to be ascertained by an overall view of the entire situation, with the result in each case governed by the facts and circumstances of the case itself. See e. g., C.B.S. Business Equipment Corp. v. Underwood Corporation, 240 F.Supp. 413, 419 (S.D.N.Y.1964); Restatement, Agency (2d) § 14J. See also e. g. Cape Shore Fish Co. v. United States, 330 F.2d 961, 965, 165 Ct.Cl. 630 (1964); Illinois Tri-Seal Products, Inc. v. United States, 353 F.2d 216, 229, 173 Ct.Cl. 499 (1965).

■ Viewing the overall situation, we agree with the trial court's conclusions (i) that independence of dealings, necessary to support a buyer-seller relationship, was lacking; and (ii) that the agreement in question, while cast in terms of a buyer and seller relation, was in reality a principal-agent relationship between the contracting parties. 58 Cust.Ct. at 637.

These conclusions, we are persuaded, are compelled by the following factors in their totality: (1) Package could not accept an order from a customer unless it was first approved by Universal; (2) the prices Package charged customers for the machines were determined by Universal; (3) the machines were delivered by Universal not to Package but directly to the customer; (4) Package was required to use its best efforts to promote the interests of Universal and to secure for Universal the goodwill of all pur-

---

7. See note 2, supra.

chasers and would-be purchasers; (5) Package was required to report to Universal all complaints coming to its attention concerning the machines; (6) Package was required to maintain places of business throughout the territory to which customers would have ready access; (7) Package was required to service the machines acquired by purchasers; (8) Package was prohibited from promoting the sales or representing manufacturers or distributors of competitive machines; (9) Package had to comply with all reasonable sales policies and regulations of Universal; (10) Package was required to "purchase" all spare parts from Universal; (11) Package was required to supply to Universal: copies of all orders received or quotations made by Package for the products; particulars of quotas and sales figures; and estimates of sales for areas within the territory; (12) in the event Universal's salesmen secured orders in the United States, the sales were to be effected through Package and Package was to receive its usual "discount"; (13) Universal agreed to save Package harmless from any liability resulting from warranties or representations the latter makes to buyers of the machines.

These factors add up to a situation in which Package had little discretion in the sale of the machines, and in which its province in the main was to find customers and relay orders to Universal. See e. g., Gulf Refining Co. v. Brown, 93 F.2d 870, 873, 875, 116 A.L.R. 449 (4th Cir. 1938); Burriss v. Texaco, Inc., 361 F.2d 169, 174 (4th Cir. 1966). Indeed, considering the import of the agreement as a whole and the testimony at trial, we think it clear that Package—while clothed in the garb of an "independent contractor"—was in reality Universal's exclusive selling agent in the United

States,[8] and that what the parties referred to as a "trade discount" from the list price allowed Package by Universal when a machine was sold was, in actuality, a selling commission—which, of course, is included in dutiable value. E. g., Muser v. Magone, 155 U.S. 240, 249, 252, 15 S.Ct. 77, 39 L.Ed. 135 (1894); Daniel F. Young, Inc. v. United States, 40 Cust.Ct. 860, 863, R.D. 9173 (1958), appeal dismissed 42 Cust.Ct. 770, A.R.D. 107 (1959).

Nor is it inconsistent with such an agency relation that Package was required to pay Universal for machines the latter shipped to the United States whether or not Package had been paid by its customers. In the circumstances of this case, that requirement was in effect a guaranty by Package that Universal would be paid for the machines it exported to the United States. "This term occurs in a frequent form of pure agency known as sale by *del credere* commission."[9] United States v. General Electric Co., 272 U.S. 476, 484, 47 S.Ct. 192, 71 L.Ed. 362 (1926). See also C.B.S. Business Equipment Corp. v. Underwood Corporation, supra, 240 F.Supp. at 421, 423–424. Likewise not inconsistent with an agency relation were the circumstances that Package paid the cost of transportation from the factory to the port of entry, selected the customhouse broker who made the customs entry and paid the estimated customs duties. "The expense of this is of course covered in the amount of * * * [its] fixed commission." United States v. General Electric Co., supra, 272 U.S. at 484, 47 S.Ct. at 195. See also C.B.S. Business Equipment Corp. v. Underwood Corporation, supra, 240 F.Supp. at 421.

Gehrig, Hoban & Co., Inc. v. United States, 54 Cust.Ct. 538, R.D. 10909 (1965)[10]—on which appellants place

8. Not including Alaska, Hawaii and the territories.

9. A *del credere* agency is one in which the agent guarantees the payment to the principal of debts that become due through his agency. See e. g., Mechem

On Agency (2d ed.) § 2534; Black's Law Dictionary (4th ed.).

10. Affirmed, United States v. Gehrig, Hoban & Co., Inc., 56 Cust.Ct. 782, A.R.D. 204 (1966); affirmed, United States v. Gehrig, Hoban & Co., Inc., 54 CCPA 129, C.A.D. 924 (1967).

heavy reliance—is quite distinguishable. In that case, the court concluded that the importer was an independent purchaser of certain machines rather than an agent of the manufacturer on the basis of a record showing, among other things, that (1) the importer gave instructions to the manufacturer; (2) the importer was free to sell the items at any price it desired; (3) the importer selected its own customers without consulting the manufacturer; and (4) the importer on various occasions ordered the machines and had them delivered for its own inventory without waiting for an order from a customer. It is manifest in these circumstances that in contradistinction to the situation here, the importer was not subject to control by the manufacturer but rather was an independent which bought and resold for its own account.

Without merit is appellants' contention that Package, if not a buyer, was a purchasing agent for the ultimate American purchaser so that its "discount" was a purchasing commission which is not included in dutiable value. The difficulty with the argument is that there is not a scintilla of evidence in the record that Package acted on behalf of or received compensation from the ultimate purchaser. Rather, the record establishes (as we have seen) that Package acted on behalf of and received its compensation from Universal—the exporter.

Lastly—relying on United States v. Massce & Co., 21 CCPA 54, T.D. 46379 (1933)—appellants argue that if the relationship between Universal and Package was that of principal-agent, there can be no export value. In Massce it was held that the dutiable value of certain wearing apparel exported from Switzerland was United States value and not export value in view of the fact that all offers for sale and all sales were made in the United States rather than Switzerland. More particularly, in that case the American purchasers contacted an American selling agency of the exporter in New York or traveling salesmen of the agency who took orders for the wearing apparel in a selected design. Delivery was made by the exporter either to the American selling agency or to the purchaser. As set out above, the contract was wholly consummated in the United States, the offer being made to the selling agency which was authorized to accept the offer on behalf of the manufacturer. On the other hand, in the present case a sale did not arise unless and until the exporter approved the order in writing. Thus, unlike Massce, whether the American purchaser obtained the merchandise was dependent upon whether the exporter was willing to sell it to him.

We affirm the findings of fact and conclusions of law of the trial judge, which we incorporate by reference. Judgment will be entered accordingly.