**C. J. TOWER & SONS OF NIAGARA, INC.**

v.

**UNITED STATES.**

**A.R.D. 312; Reappraisement R64/6271.**

United States Customs Court,
First Division, Appellate Term.
Feb. 7, 1973.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for appellant.

Harlington Wood, Jr., Asst. Atty. Gen. (Marlene G. Sonderlick, New York City, Trial Atty), for appellee.

Before WATSON, MALETZ, and RE, Judges.

MALETZ, Judge:

This is an application for review of the decision of the trial court affirming the government's appraisement of certain vulcanizing equipment for the repair of passenger and truck tires. 67 Cust.Ct. 513, R.D. 11754 (1971).

The equipment was exported on February 9, 1959, by the manufacturer, Vulcan Equipment Co., Ltd., of Toronto, Canada (hereafter referred to as the "Canadian Company") to its wholly owned subsidiary, Vulcan Tire Equipment Co., Inc., of Niagara Falls, New York (hereafter referred to as the "American Company" or the "American Subsidiary" or "Subsidiary").

The equipment was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(b)), at various unit values, in United States funds, less 2 percent, less segregable components of United States origin, less $16.00 prorated, less duty included, packed. The parties agree that export value is the proper basis of appraisement; they likewise are in agreement as to the segregable components of United States origin and their value. In this context, the principal dispute arises from a claim by appellant (plaintiff below) that a sale took place between the Canadian Company and its wholly owned American Subsidiary; that the American Subsidiary therefore was a "selected purchaser" as defined in section 402(f)(1)(B) of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a(f)(1)(B)); and that the various invoice prices billed the American Subsidiary by the Canadian Company, less 2 percent in Canadian funds, fairly reflected the market value of the imported merchandise. Appellee (defendant below), on the other hand, contended (among other things) that the American Company was not a bona fide purchaser from the Canadian Company but an agent of the latter. Against this background, the trial court held that the relationship between the Canadian Company and its American Subsidiary was not that of seller and buyer but rather was that of a principal and agent. Hence the trial court concluded that a "sale" within the meaning of section 402(b) did not occur and that the American Subsidiary was therefore not a "purchaser" within

860

the meaning of section 402(f)(1)(B). For the reasons that follow, we affirm.

Considering first the record, the following relevant facts appear: The American Subsidiary was incorporated in the United States as a subsidiary of the Canadian Company in November 1957[1] and from that time to February 1, 1959, was operated as a branch office of the Canadian Company to handle the service and repair of the Canadian Company's products in the United States. On and prior to February 9, 1959, Bernard D. Alm was general sales manager and secretary-treasurer of both the Canadian and American Companies, while his father, E. J. Alm, was the majority stockholder of both.

In the period preceding February 9, 1959, the Canadian Company sold merchandise such as that involved in this case directly to jobbers and distributors in both Canada and the United States. However, according to the testimony of Bernard D. Alm (hereafter referred to as "Alm"), on or about February 1, 1959, the Canadian Company appointed the American Subsidiary as its exclusive distributor in the United States market and commenced selling in that market only to that Subsidiary with the exception of pending sales that were outstanding before February 1, 1959. The first entry by the American Company, Alm stated, was made on February 9, 1959. Alm further testified that this exclusive distribution agreement was contained in the minutes of the directors' and shareholders' meetings but that aside from those minutes, there were no other written agreements.[2]

After February 1959, the American Subsidiary continued to operate at the same physical location as it had when it was a branch office of the Canadian Company. It acquired land in the United States during the course of the year 1959 and maintained an inventory in the United States amounting to approximately $20,000 during the year ending April 30, 1959, which inventory consisted for the most part of used or reconditioned merchandise. Its staff was composed of two employees and a sales representative in New Jersey who were paid by the American Company from an account at a bank in Niagara Falls, New York. The American Company paid taxes to the United States and to the State of New York for the period which included February 9, 1959, and those taxes were based upon the alleged purchase price from the Canadian Company. The tax returns for the year which included February 9, 1959, were audited and accepted by New York and by the United States after their representatives went to Toronto to examine the books and records.

The witness Alm further testified that after February 1, 1959, the American Company maintained a petty cash fund; handled shipment of parts and equipment to customers in the United States from its Niagara Falls address; handled all the service and repair of equipment in the United States that was returned for repairs; and was responsible for warranty and product guaranty costs.

Beyond that, the record shows that the Canadian Company handled the accounting and bookkeeping functions of the American Subsidiary; kept the latter's books and records in Toronto; and handled all the Subsidiary's invoicing, account adjustments and other administrative clerical work. The record also shows that Alm, the secretary-treasurer of both companies, could, in conjunction with one other signing officer of the Canadian Company, make money transfers between the two companies without authorization of the board of directors or shareholders of either firm. Alm, in addition, set the prices to be charged jobbers in the United States as well as Canada.

After February 1, 1959, the Canadian Company's salesmen in the United

1. The Canadian Company was incorporated in October 1955.

2. Alm did not bring to trial the minutes thus referred to.

States market continued to remain on that company's payroll and worked out of Toronto but that proportion of their time which was spent in the United States market was charged to the American Company. Likewise, the Canadian Company continued to print and distribute price lists and send them directly to jobbers in the United States; continued to distribute sales manuals for use in the United States; and continued to correspond directly with United States jobbers with regard to sales. Further, the price lists of new merchandise appeared on the stationery of the Canadian Company, and not one price list or offer of new merchandise appears to have been sent by the American Company to United States purchasers.[3]

Orders by United States jobbers were placed directly with the Canadian Company or, if placed with the American Subsidiary in Niagara Falls, were forwarded by it to Toronto. In turn, payments by jobbers were made directly to the Canadian Company or to the American Company at the Canadian Company's address. Relevant on this score is the following excerpt from "Memo # 8" that the Canadian Company sent to all jobbers on February 19, 1959:

NEW PROCEDURE

As of February 1, 1959, all American sales of Vulcan Equipment will be made through our subsidiary: Vulcan Tire Equipment Co. Inc., 767½ Seventeenth Street, Niagara Falls, N. Y. *All equipment since February 1, 1959, has been invoiced by Vulcan Tire Equipment Co., Inc. and cheques covering these bills should be made payable to that firm care of 55 Research Road, Toronto 17, Ontario, Canada.* Payment of earlier invoices, as indicated on same, should be addressed in the normal manner to Vulcan Equipment Co. Ltd., 55 Research Rd., Toronto 17, Ontario, Canada. In order to avoid a lot of confusion, we would appreciate clearing up the old Vulcan Equipment account as quickly as possible.

*All correspondence, orders, etc.—although directed to Vulcan Tire Equipment—should still be mailed to 55 Research Road.* Pending orders have been transferred to Vulcan Tire Equipment and will not be delayed. For the present, the Niagara Falls personnel are instructed not to accept phone calls, etc. in that *the majority of the sales promotion and paper work is handled through Toronto. Initially, the branch office will only take care of adjustments, rush parts, etc. and the majority of orders will be shipped directly from the Toronto factory.* Later we are expecting to commence manufacturing and assembly operations in Niagara Falls. [Emphasis added.]

The price lists issued to the United States jobbers indicated an f.o.b. Toronto basis; however, the jobbers were billed on the basis of either f.o.b. Toronto or f.o.b. Niagara Falls, depending on where the equipment was shipped from. In this connection, many, if not the majority of the items of equipment, were shipped directly from the Canadian Company to the United States jobbers who were billed f.o.b. Toronto. In the case of a direct shipment, the Canadian Company, purportedly acting on behalf of the American Company, prepared in Toronto the jobber invoice for the American Company and mailed it from Toronto to the jobber. In addition, the Canadian Company sent a second invoice to the Subsidiary. The bill of lading for merchandise sold to the United States jobbers in this manner was drafted to transfer the merchandise directly from the Canadian Company to the jobber. In that event, the merchandise never entered the inventory of the American Subsidiary.

---

3. The record contains one price list dated December 28, 1960, that appears on the stationery of the American Subsidiary. See defendant's Exhibit S. This price list, however, was applicable only to used equipment.

In those instances where the Canadian Company shipped to the American Company, there was only one invoice, namely from the Canadian Company to the American Company. Similarly, when the American Company shipped from its inventory in Niagara Falls to a United States jobber, there was only one invoice, i. e., from the American Company to the United States jobber. However, it is to be noted that (as indicated previously) the invoice from the American Company in the latter situation was prepared by the Canadian Company.

All the sales and administrative expenses incurred by the Canadian Company with respect to sales in the United States market were paid for by the American Subsidiary by bank transfer rather than by check. Further, computation of the amounts transferred was not based on the actual amounts expended by the Canadian Company on behalf of the American Subsidiary but instead was based on the proportion of sales in the United States to total sales of the Canadian Company and on "administrative activity". Thus, the witness Alm stated that the American Subsidiary was charged for 45 percent of the "administrative expense" of the Canadian Company, and was also charged for 25 percent of the "selling expense" of the Canadian Company.

■ Coming now to the legal aspects, it is established that "[a] corporation does not become an agent of another corporation merely because a majority of its voting shares is held by the other." Restatement, Agency (2d), § 14 M. See also *id.*, Appendix, § 14 M. And see e. g., Greb Industries, Ltd. v. United States, 64 Cust.Ct. 608, R.D. 11691, 308 F.Supp. 88 (1970); United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964). "[T]he decisive consideration which distinguishes a principal-agent relationship from a buyer-seller relationship is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him." Dorf International, Inc. et al. v. United States, 61 Cust.Ct.

604, 610, A.R.D. 245, 291 F.Supp. 690, 694 (1968). Put otherwise, "[o]ne who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." Restatement, Agency (2d), § 14 N. Whether a principal-agent or seller-buyer relationship exists "is to be determined by the substance of the transaction—not by the labels the parties attach to it. * * * No single factor is determinative; rather, the relationship is to be ascertained by an overall view of the entire situation, with the result in each case governed by the facts and circumstances of the case itself." Dorf International, Inc. et al. v. United States, *supra*, 61 Cust.Ct. at 610, 291 F.Supp. at 694.

■ Viewing the overall situation, we agree with the trial court's conclusion that the merchandise in question was not sold to the American Company, but that the American Company was a selling agent of the Canadian Company. This conclusion, we are persuaded, is compelled by the following factors in their totality: (1) The Canadian Company handled the accounting and bookkeeping functions of the American Company and handled all the latter's invoicing, account adjustments and other administrative clerical work; (2) Bernard Alm—the son of the majority stockholder of both companies and the general sales manager and secretary-treasurer of both—set the prices to be charged jobbers in the United States; (3) Alm, in addition, in conjunction with another signing officer of the Canadian Company, could make money transfers between that company and its American Subsidiary without authorization of the board of directors or shareholders of either firm; (4) all but one of the salesmen in the United States market were on the payroll of the Canadian Company though that portion of their time which was spent in the United States market was ostensibly charged to the American Company; (5) the Canadian Company printed and distributed price lists and

sales manuals and sent them directly to the jobbers in the United States; (6) the majority of the sales promotion work was handled in Canada; (7) the price lists of new merchandise appeared on the stationery of the Canadian Company, and not one price list or offer of new merchandise appeared to have been sent by the American Company to jobbers in the United States; (8) the Canadian Company corresponded directly with United States jobbers with regard to sales; (9) orders by United States jobbers were placed directly with the Canadian Company or, if placed with the American Subsidiary in Niagara Falls, were forwarded by it to Toronto; (10) payments by jobbers in the United States were made directly to the Canadian Company or to the American Company at the Canadian Company's address; (11) many, if not the majority of the items of equipment in question, were shipped directly from the Canadian Company to the United States jobbers who were billed f.o.b. Toronto; (12) with respect to such direct shipments, the Canadian Company prepared two invoices—one of which it sent directly to the jobber ostensibly on behalf of the *American Company* while another invoice was sent to the American Company; (13) the bill of lading for merchandise sold to the United States in this manner was drafted to transfer the merchandise directly from the Canadian Company to the jobber; (14) when the American Company shipped an item from *its* inventory in Niagara Falls to a jobber in the United States, the jobber invoice was prepared by the Canadian Company; (15) all the sales and administrative expenses incurred by the Canadian Company with respect to sales in the United States market were paid for not by check but rather by bank transfers; and (16) computation of the amounts thus transferred was not based on the actual amounts expended by the Canadian Company on behalf of the American Subsidiary but instead was based on the proportion of sales in the United States to total sales of the Canadian Company and "on administrative activity".

These factors, we think clear, add up to a situation in which the Canadian Company and its Subsidiary were operated by a single management which fully controlled every aspect of the entire business at both Toronto and Niagara Falls, with the right to transfer assets and liabilities and allocate expenses between the two firms, apparently without restriction. The accounting functions were performed only by the Canadian Company which could thus at its option transfer or divide debts, expenses and income, depending upon how the officers wanted the firms' profits to fall.

In short, after February 1, 1959, there seems to be no significant difference in the method of operation of either the Canadian Company or its American Subsidiary in Niagara Falls when the new system was alleged to have been effectuated. Indeed, in announcing the new system to the trade, the Canadian Company emphasized that after February 1, 1959, all checks from jobbers in the United States should be made payable to the American Company care of the Canadian Company's address in Toronto; that all correspondence and orders should still be, although directed to the American Company, mailed to the Canadian Company's address in Toronto; that the majority of the sales promotion and paper work would be handled through Toronto; that initially "the branch office" [i. e., the American Subsidiary] will only take care of adjustments and rush parts; and that the majority of orders would be shipped directly from the Toronto factory.

In support of its contention that the American Company was a purchaser from, rather than an agent of, the Canadian Company, appellant relies upon Greb Industries, Ltd. v. United States, *supra*, 64 Cust.Ct. 608, 308 F.Supp. 88. However, reliance upon that case is misplaced. In *Greb Industries*, the court found that Greb, a Canadian manufacturer, *sold* its skating outfits to Bauer Canadian Skate, Inc., its wholly owned

subsidiary corporation in North Tonawanda, New York. Bauer maintained its own warehouse in North Tonawanda, New York; had its own bank account; filed its own income tax returns; and paid its own taxes in the United States. However, in contradistinction to the situation here, Greb did not ship ice skating outfits directly to jobbers or dealers in the United States, but rather shipped the outfits to Bauer for warehousing in North Tonawanda, from which point *Bauer sold* the outfits to its retail purchasers in the United States. Further, Bauer warehoused the merchandise until it resold it to purchasers in the United States. The record in *Greb Industries* showed, in addition, that Bauer paid from its own account for the goods shipped to it by Greb, and payment was due in 30 days, as in all other sales by Greb. Finally, unlike the present case, payment for goods shipped to Bauer by ·Greb was effected by checks that were drawn on Bauer's own bank in the United States.[4]

Based on the record before us, we must conclude that the overwhelming weight of the evidence establishes that the American Subsidiary was owned, operated and controlled by the Canadian Company and was, in effect, a branch office of the parent company. See e. g., Robert E. Landweer & Co., Inc., etc. v. United States, 63 Cust.Ct. 682, A.R.D. 261 (1969); Service Afloat, Inc., Howard Hartry, Inc. v. United States, 68 Cust.Ct. 225, R.D. 11761, 337 F.Supp. 458 (1972), aff'd, 70 Cust.Ct. ——, A.R.D. 311 (1973). For the foregoing reasons, we affirm the decision and judgment of the trial court that the merchandise was not sold by the Canadian Company to the American Company, but that the American Company was a selling agent of the Canadian Company. Thus, it must be concluded (1) that appellant has failed to prove that the American Company was a selected purchaser of the imported merchandise; and (2) that the proper dutiable values are represented by the appraised values.

---

4. A case presenting a factual situation very similar to that in *Greb Industries* is Wood v. United States, 68 Cust.Ct. 259, R.D. 11766, 340 F.Supp. 1398 (1972) (application for review ·pending). In that case, the court, following *Greb Industries*, held that the American Subsidiary was a purchaser from, rather than a selling agent of, its Canadian parent corporation.