**GLENSIDE STEEL COMPANY and Gerry Schmitt & Company**

v.

**UNITED STATES.**

**C. D. 4466; Reappraisements R69/5355 and 14 others.**

United States Customs Court.

Aug. 15, 1973.

Barnes, Richardson & Colburn, New York City (Irving Levine, New York City, of counsel), associate counsel, for plaintiffs.

Irving Jaffe, Acting Asst. Atty. Gen. (James Caffentzis, trial attorney, New York City), for defendant.

MALETZ, Judge:

This case involves 15 consolidated appeals for reappraisement of certain imported steel products consisting of cold rolled steel coils; hot rolled steel coils, plain and pickled; and hot rolled steel flats. The steel products were manufactured in Germany and were originally purchased by Nimpex International, Inc. of New York City and consigned to various purchasers in the Chicago, Illinois area. The importations were loaded in the hold of the SS. NORDMEER but failed to reach their destination due to the fact that the vessel sank in Lake Huron on November 19, 1966.

The merchandise was sold by the insurer on an "as is" condition, as it lay in the hold of the NORDMEER, to the highest bidder, plaintiff Glenside Steel Company (Glenside)[1] for a price of $25.51 per net short ton landed at Rockport, Michigan, duty not paid. Subsequently, the merchandise was salvaged from the hold of the NORDMEER and entered at the port of Saginaw, Michigan during the period from February 1967 through July 1967.

The merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930,

---

1. Glenside is considered the importer for the purposes of this controversy, while Gerry Schmitt & Co. is the custom house broker.

as amended by the Customs Simplification Act of 1956,[2] at the following rates:

*Cold Rolled Coils*—U.S. $107.50 M/T [metric ton] base, and European extras per M/T or less where applicable, net, pkd., less NDC's [nondutiable charges] of $3.00M/T.

*Hot Rolled Coils—Plain*—U.S. $89.00 per M/T base net, pkd., less NDC's of $3.00 M/T.

*Hot Rolled Coils—Pickled*—U.S. $94.-80 M/T base net, pkd., less NDC's of $3.00 M/T. .

*Hot Rolled Flats*—U.S. $87.00 M/T base and extras, per European list, net, pkd., less NDC's of $3.00 M/T.

■ In either initial complaint, plaintiffs alleged that the appraised values were erroneous on the stated ground that they did not take into consideration the condition of the merchandise as entered, and that the correct value was $25.51 per ton, f.o.b. Rockport, Michigan, in accordance with the provisions of section 563(a) of the Tariff Act of 1930, as amended. That section permits, in certain circumstances, an abatement or allowance for any injury, deterioration, loss or damage sustained by any imported merchandise while within the limits of any port of entry and before having been landed. However, plaintiffs neither presented any proof at trial nor argued in their brief in support of this claim. The claim is, therefore, dismissed for failure to prosecute. See e. g., J. E. Bernard & Co., Inc. v. United States, 55 Cust.Ct. 17, 18, C.D. 2549 (1965), aff'd 53 CCPA 116, 118, C.A.D. 886 (1966).

Subsequently, plaintiffs amended their complaint to allege that, while export

value is the proper basis of appraisement, the proper dutiable value is $25.51 per ton, f.o.b. Rockport, Michigan. Plaintiffs contend alternatively that at the port of entry (after salvaging operations and the condition of the merchandise was known, and after moving the merchandise from Rockport to Detroit) the merchandise had a maximum export value of $40 per net ton.

As a further alternative claim, plaintiffs contend that there is no export value for such or similar merchandise and that United States value is the proper basis of appraisement. Such value, it is argued, is represented by the importer's resale price.

Finally, plaintiffs contend—again alternatively—that there is no export or United States value for such or similar merchandise and that constructed value is the proper basis of appraisement and that $25.51 per ton is the correct amount for such value.

Turning now to the record, the following factual situation emerges. On November 19, 1966, the SS. NORDMEER, en route to Chicago, Illinois from a port in Germany, sank in Lake Huron off Thunder Bay Island, Michigan. The ship was 14 miles offshore when it went down and is the only ship known to have ever sunk in Lake Huron. It was carrying a load of coiled steel and steel flats. A coil is a flat sheet of metal with a length ranging from one to three thousand feet. Its average thickness is from three-quarters of an inch to 0.02 of an inch, while its width ranges from thirty to sixty inches in intervals of two inches.

The coils on the NORDMEER were protected from rusting by waste metal

---

**2.** Section 402(b) of the Tariff Act of 1930, as amended, reads:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

sheets which were wrapped around the coils; inside these sheets were paper envelopes. The steel flats aboard the NORDMEER were straight flat bars of steel whose widths were greater than their thickness.

The record shows that when a coil is submerged in water, the water penetrates in between the turns of the coil and affects the steel. The steel gets rusty and, depending upon the aggravating factors in the water and the quality of the water, it becomes pitted and the surface of the steel becomes partially destroyed. Thus, if a coil is completely submerged in salt water for a period of two to three weeks, destruction of the surface of the material would begin to occur. On the other hand, if the same coil were submerged in clear stream water, the process would be slower and the rust condition would be less severe during the same period of time. The Great Lakes contain chemical pollutants and, hence, steel submerged therein would deteriorate at a rate somewhere between that of sea and fresh water, leaning more towards that of sea water.

First-quality steel must have a smooth surface. When the rust eats into the surface of the steel causing little holes to form, the steel becomes pitted. Even without pitting, rusting surfaces on coils substantially lessen their value. However, surface rust can be removed either by pickling (i. e., using an acid bath to remove scale and rust) or by vibrating, which is a mechanical means of removing the rust. These rust-removal methods are not used on scrap steel but only on steel having a uniform surface rust. It is to be added that if steel becomes pitted to any significant extent, it is considered scrap and is usually melted down again.

With these considerations in mind, the German underwriters, in order to avoid a total loss, engaged Martin Meseck, a retired sea captain and cargo surveyor, to salvage whatever he could of the car-go and resell it. To this end, on December 1 and 2, 1966—approximately 11 days after the vessel sank—Captain Meseck boarded the vessel—which was submerged up to its deck area—to determine whether the cargo could be discharged and brought ashore. During this visit, Meseck was able to observe, through the reasonably clear water, the tops of steel coils in five of the submerged hatches. According to Meseck who was a witness at the trial, the steel was stored about three or four coils high or approximately twelve to fifteen feet in height. Thus, Meseck was able to view approximately one-quarter to one-third of the imported merchandise. He observed that the merchandise had started to develop rust and "some steel which was stored, like the flats in the 'tween decks, was visibly very badly rusted" (R.14). However, he saw no pitting.

Subsequently, in an effort to sell the cargo, Meseck contacted approximately 15 steel companies who bought and sold salvaged steel. Eight firms showed initial interest, but only three were present at the actual bidding which took place in Detroit on December 16, 1966 at the offices of the attorneys for the underwriters. The highest bid was $25.51 per ton, submitted by plaintiff Glenside, and the parties entered into a contract at that price. It is to be noted that Glenside bid for this merchandise *sight unseen* while it was still under water and that its price offer of $25.51 was based on contemplated damage to the steel.

Due to the extensive damage to the vessel, the NORDMEER was abandoned to the United States Corps of Army Engineers, and it was not until January 9, 1967 that permission was obtained to salvage the merchandise from the vessel. Although salvaging began on January 9—approximately fifty days after the vessel had sunk—the extreme cold and snow prevented any substantial salvaging operations until the period between May and June of 1967 when the majority of the entries were made. Most of

the merchandise was, therefore, submerged in the waters of Lake Huron from November 19, 1966 through at least May 1967.

Meseck, it is to be observed, never saw the salvaged merchandise after it was removed from the water; however, one of his assistants viewed the merchandise after its removal from the water, described its condition to him, and showed him close-up pictures of the merchandise.

In Meseck's opinion, the imported merchandise taken out of the water after four to six months would be heavily rusted with pitting on both the exposed and inside areas. He testified that the normal way to find the value of damaged steel for settlement and appraisal purposes would be to depreciate the value of the damaged material by deducting a certain percentage for deterioration from the "sound market value" of the merchandise. In this connection, Meseck stated that at the time of the sale to Glenside the value of the merchandise in question, while in the hold of the ship, was $25.51 per short ton. After the material was recovered and transported to Detroit, he estimated that its value increased to $35.00 or $40.00 per ton.

Finally, Meseck expressed the opinion that the merchandise in issue was appraised by the government at values which approximated the values of first-quality merchandise in 1966, and that the merchandise could not have been sold in the United States at prices as high as the appraised values.

Plaintiffs' other witness, Robert Newstat, the president of Glenside, testified that he authorized his agent to bid up to $27.50 per ton for the merchandise, sight unseen, which price was based upon Newstat's estimate of what the condition of the merchandise would be when landed. However, Newstat, as in the case of the prior witness, Meseck, had likewise never seen the imported merchandise after it was salvaged.

In rebuttal, the government called two witnesses, the first of whom was Lloyd Vest, port director for the Bureau of Customs at Saginaw/Bay City, Michigan. Vest testified that he examined some of the merchandise entered at the port after it had been removed from the water and observed some surface rust on the coils but did not notice any pitting. He further testified that the merchandise was "in good physical shape" which meant that it had not been dropped and that the ends of the coils were not dented.

Defendant's second witness, Roy K. Nattress, a customs inspector at Saginaw, testified that he had examined the remaining shipments entered at the port and noted that the steel was "in good physical condition" with "minor surface rusting". The rust, he testified, was not in the form of rust scale but consisted of a powdery bloom which, if rubbed, would come off in one's hand in a fine powder.

■ Coming now to the legal aspects, it is, of course, basic (1) that there is a presumption that the values found by the appropriate customs official are the correct values for the imported merchandise, and (2) that there is a subsidiary presumption that the appropriate customs official found every fact necessary to arrive at his appraised values. E. g., United States v. New York Merchandise Co., Inc. 58 CCPA 53, C.A.D. 1004, 435 F.2d 1315 (1970); E. I. du Pont de Nemours & Co. v. United States, 27 CCPA 146, C.A.D. 75 (1939); Arthur Springut v. United States, 50 Cust.Ct. 355, R. D. 10417 (1963). Applying these principles here, it is evident that there is a presumption that the appraised value represents "the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold * * * in the principal markets of the country of exportation * * * in the ordinary course of trade, for exportation to the United States * * *."

Against this background, we must conclude for the reasons that follow, that plaintiffs have entirely failed to rebut this presumption. In the first place, plaintiffs did not produce any witness to testify as to the original price at the time of exportation at which such or similar merchandise was sold for exportation to the United States. Second, plaintiffs did not even produce any witness who actually saw the merchandise in the condition in which it was imported into the United States. True, plaintiffs' witness Meseck saw a part of the merchandise, but this was while it was under water. The point is that he did not see the imported steel after it was removed from the water; instead, he relied upon photographs and representations of an associate in reaching the conclusion that the merchandise, when salvaged, was heavily rusted and pitted. Further, plaintiffs' other witness, Newstat, never saw the merchandise.

By contrast, defendant's two witnesses not only viewed the salvaged merchandise but testified that they found it to be in "good physical shape" with only minor surface rust. Such eyewitness evidence clearly rebuts the testimony of plaintiffs' witnesses which was based on estimates of possible damage.

In reaching this conclusion, we are quite mindful of the testimony of Meseck to the effect that there is a correlation between the deterioration of steel submerged in water and the nature of the water in which it is submerged. Thus, as we have seen, Meseck testified that salt water will rust and pit steel in less time than fresh water, and that chemical pollutants, such as those present in the fresh water of Lake Huron, would have an effect on the rate of deterioration. We are also quite mindful of Meseck's testimony that the rate of deterioration in Lake Huron would vary depending upon the part of the lake in which the boat sank. However, when it is considered that the NORDMEER was the first boat ever to sink in Lake Huron, and that the degree of pollution in that part of the lake was unknown, Meseck's opinion as to the actual rate of deterioration of the steel in question is highly speculative and thus entitled to little probative weight.

Nor can it be overlooked that plaintiffs (i) failed to produce a witness who had actually observed the steel after it had been salvaged, although the record referred to such persons; (ii) failed to produce various reports and photographs referred to in the record which would tend to establish the condition of the salvaged steel; and (iii) failed to call as a witness any ultimate purchaser who could have established the quality of the merchandise as received. The short of the matter is that plaintiffs have failed entirely to establish that the condition of the steel was so damaged as to make the appraised values erroneous.

According to Meseck, the normal way of determining the value of damaged merchandise is to ascertain its sound market value and then allow an amount for depreciation commensurate with the damage actually incurred. See A. Hofmann, Inc. v. United States, 21 CCPA 431, T.D. 46944, 71 F.2d 316 (1934). Here, rather than attempting to supply the court with concrete facts to support their claim on this basis, plaintiffs are apparently requesting the court to find a value based upon a purchase price which does not reflect the actual damage to the merchandise but represents a mere unsupported estimate as to the amount of damage actually sustained. In sum, plaintiffs have failed to produce evidence that the appraised value does not represent the "true value" of the merchandise imported.

Plaintiffs have also failed to establish that the price of $25.51 per ton represents the price at which such or similar merchandise was freely sold or offered for sale in the principal markets of the country of exportation, i. e., Ger-

many, for exportation to the United States. Through plaintiffs' witness, Meseck, it was established that there was a regular market for damaged and salvaged steel, but no evidence was presented to show the price at which such or similar merchandise was freely sold in Germany for exportation to the United States. Plaintiffs' contention that the circumstances present here should relieve them of the obligation of proving this element of export value is totally without legal support and clearly contrary to the valuation statute itself.[3]

Moreover, considering the factors surrounding the purchase and sale of the imported merchandise, it must be concluded that the price derived therefrom is neither a price which represents export value for the imported merchandise nor for that matter a "true market value". The record establishes that Meseck sent inquiries to some fifteen companies concerning the present merchandise, of whom eight expressed interest. Immediately, five potential buyers withdrew because the purchase would have been "sight unseen". In these circumstances, it is apparent that the merchandise was not freely offered to all purchasers in the ordinary course of trade. As previously discussed, value for damaged steel, according to the witness Meseck, is determined by examining the merchandise, calculating the depreciation, and making an appropriate allowance for the damage. This being the case, offering to sell the merchandise "sight unseen" was not the normal and usual manner in which damaged steel was sold. Since the potential buyer took many additional risks in purchasing the

merchandise "sight unseen", the price he offered to pay for it was, of necessity, initially deflated. Similarly, the seller in the present case, the insurance company, was interested merely in avoiding a total loss on the cargo insured by it. The situation here is thus analogous to that in Hoenig Plywood Corp., et al. v. United States, 41 Cust.Ct. 607, A.R.D. 91 (1958), where the court rejected the renegotiated price between the importer and the manufacturer for certain defective plywood. The court reasoned as follows (41 Cust.Ct. at 611):

> * * * Many considerations may have entered into the subsequent agreement between the parties resulting in the allowances here shown which are not necessarily consistent with a freely offered price to all purchasers, as the statute requires. * * * There is nothing in the instant record which remotely establishes the price at which inferior merchandise such as here involved was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade. * * *

In brief, what was offered for sale in the present case was not salvaged or damaged steel, but rather steel "sight unseen" which had sustained some damage, the extent of which was unknown. Thus, the potential buyers did not know exactly what they were purchasing; accordingly, the method of determining the value of salvaged or damaged steel —i. e., to find the amount by which it had depreciated—was not utilized.

Turning to another aspect, it is clear that the invoice price of $25.51 per ton bears no relationship to the actual or

---

3. Plaintiffs cite Dorf International, Inc. et al. v. United States, 61 Cust.Ct. 604, A.R.D. 245, 291 F.Supp. 690 (1968), as supporting this contention. But that case merely held that the relationship between the Canadian manufacturer and the importer was not one of seller and buyer, but rather one of principal and agent. Therefore, the court concluded that export value was represented by the prices at which the manufacturer sold its merchandise to the ultimate United States purchaser. Contrary to plaintiffs' contention that the sale of the agent to its United States customer constituted an export sale, the thrust of that decision is that the sale of the principal in Canada through its agent was the sale for exportation to the United States.

true value of the merchandise. In this regard, it is noted that the cold rolled coils which were appraised at $107.50, the hot rolled coils—plain—which were appraised at $89.00, the hot rolled coils —pickled—which were appraised at $94.80, and the hot rolled flats which were appraised at $87.00,[4] approximated, according to plaintiffs' witness, Meseck, the going price for first quality merchandise in 1966. Notwithstanding that the original value of each type of article thus varied, the value claimed by plaintiffs (on all the alternative claims) is a single flat amount for all four types of articles. However, because of the difference in the type and quality of these articles, their proper salvage value would necessarily also have to vary. Hence, the uniform prices which plaintiffs contend represent the correct value of the imported merchandise, could only constitute the correct value if the importations consisted of scrap steel. But Meseck's testimony makes it clear that the importations were *not* scrap steel

(which sold in 1966 in a range between $8 and $18 a ton).

In view of the foregoing, we think it manifest that the $25.51 price claimed by plaintiffs does not satisfy the statutory elements of export value. In this circumstance, the addition of salvaging and transportation costs to Detroit to that price does not transform it into the proper export value for the merchandise. Thus, the $40.00 per ton figure estimated by Meseck as the proper value is of no probative worth in determining the export value of the merchandise.

■ We consider now plaintiffs' alternative contention that United States value is the proper basis of appraisement. It is elementary in this respect that an importer claiming appraisement under United States value, as provided for in section 402(c) of the Tariff Act of 1930, as amended,[5] is required by section 402(a) to negate the existence of export value for such or similar merchandise.[6] Therefore, it was incum-

---

4. In each instance, these values were reduced $3.00 by the appraiser for nondutiable charges.

5. Section 402(c), as amended, reads:

(c) *United States Value.*—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

(2) the usual costs of transportation and insurance and other usual expenses incurred with respect to such or similar merchandise from the place of shipment to the place of delivery, not including any expense provided for in subdivision (1); and

(3) the ordinary customs duties and other Federal taxes currently payable on such or similar merchandise by reason of its importation, and any Federal excise taxes on, or measured by the value of, such or similar merchandise, for which vendors at wholesale in the United States are ordinarily liable.

If such or similar merchandise was not so sold or offered at the time of exportation of the merchandise undergoing appraisement, the United States value shall be determined, subject to the foregoing specifications of this subsection, from the price at which such or similar merchandise is so sold or offered at the earliest date after such time of exportation but before the expiration of ninety days after the importation of the merchandise undergoing appraisement.

6. Section 402(a) of the Tariff Act of 1930, as amended, reads:

(a) *Basis.*—Except as otherwise specifically provided for in this Act, the value of imported merchandise for the purposes of this Act shall be—

(1) the export value, or

(2) if the export value cannot be determined satisfactorily, then the United States value, or

bent upon plaintiffs not only to prove that there was no export value for such merchandise, but also that there was no export value for similar merchandise or that there was no similar merchandise. See e. g., R. J. Saunders & Co., Inc. v. United States, 70 Cust.Ct. ——, A.R.D. 314, 359 F.Supp. 1394 (1973).

On this score, plaintiffs presented no evidence to establish that, at the time of exportation, such or similar damaged steel was not freely sold or offered for sale in Germany in the ordinary course of trade for exportation to the United States, let alone the price of such or similar steel. Cf., United States v. E. R. Squibb & Sons et al., 42 CCPA 23, C.A. D. 564 (1954).

■ But even if it were to be assumed that plaintiffs have proven that no export value exists for the imported merchandise, they have failed completely to prove all the necessary elements of United States value. The only testimony concerning the sale of the imported merchandise in the United States was given by the witness, Newstat, president of Glenside. The relevant facts elicited from this witness were that he did not know the condition of the steel his company bought, nor did he know whether the people who bought the steel from Glenside had viewed the steel. No evidence was presented concerning how the merchandise was sold; whether there were sales of such or similar merchandise at the time of exportation to the United States (United States v. New York Merchandise Co., Inc., 31 CCPA 213, C.A.D. 274 (1944)); whether the merchandise was freely sold to all purchasers at wholesale; and whether the merchandise was sold in the ordinary course of trade. The fact that Glenside resold the merchandise for $35.53 per ton does not *ipso facto* establish a United States value for it unless all the other necessary elements of the statute are satisfied. And proof regarding such other statutory requirements is entirely lacking.

■ Plaintiffs' final claim that the sum of $25.51 per ton represents the constructed value of the merchandise must also be rejected. As pointed out previously, under the provisions of section 402(a) of the 1930 Tariff Act, it is incumbent upon plaintiffs to show that neither export value nor United States value can be satisfactorily determined before invoking the constructed value basis of appraisement under section 402(d).[7] However, as already discussed, plaintiffs have failed to negate the existence of either export value or United States value. For that reason, they may not resort to constructed value as the proper basis of appraisement. What is more, even if constructed value were assumed to be the proper basis, plaintiffs' proof falls far short of establishing the

---

(3) if neither the export value nor the United States value can be determined satisfactorily, then the constructed value;
* * *.

7. Section 402(d), as amended, reads:
(d) *Constructed Value.*—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—
(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of

the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and
(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

correct constructed value for the imported merchandise. Thus, plaintiffs have offered absolutely no evidence with respect to the "cost of materials * * *" or the "amount for general expenses and profit * * *." Similarly, plaintiffs presented no proof concerning the third statutory element of constructed value.

From what has been said, it is concluded that plaintiffs have failed both to overcome the presumptively correct values for the imported merchandise and to prove that their claimed values are correct. The appeals for reappraisement are, therefore, dismissed and the appraised values affirmed. Judgment will be entered accordingly.