**MITSUI & CO., Ltd.**
**Mitsui & Co. (USA), Inc.**

v.

**UNITED STATES.**

R. D. 11767; Reappraisement R67/10846 and 33 others.

United States Customs Court.
April 12, 1972.

---

L. Patrick Gray, III, Asst. Atty. Gen. (Patrick D. Gill and John A. Winters, New York City, trial attorneys), for defendant.

WATSON, Judge:

These thirty-four appeals for reappraisement consolidated for the purpose of trial, cover importations designated as tricalcium phosphate exported from Japan between 1964 and 1967. The importations are not on the Final List of the Secretary of the Treasury, T. D. 54521.

The merchandise was appraised on the basis of export value as defined in section 402(b) [1] of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The plaintiff's [2] principal claim is that although export value is the proper basis of valuation of the importation, it should be an amount other than that found by the appraising official. In the alternative, plaintiff contends that there is no export value at all for the importations and that United States value as defined in section 402(c) [3] of the Tariff Act of 1930, as

Barnes, Richardson & Colburn, New York City (Earl R. Lidstrom and Hadley S. King, New York City, of counsel,) for plaintiffs.

[1]. (b) *Export value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

[2]. For ease of discussion plaintiffs will be referred to in the singular.

[3]. (c) *United States value.*—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

(2) the usual costs of transportation and insurance and other usual expenses incurred with respect to such or similar merchandise from the place of shipment to the place of delivery, not including any expense provided for in subdivision (1) of this subsection; and

(3) the ordinary customs duties and other Federal taxes currently payable on such or similar merchandise by reason of its importation, and any Federal excise taxes on, or measured by the value of, such or similar merchandise, for which vendors at wholesale

amended by the Customs Simplification Act of 1956, is the proper basis for appraisement.

The dispute in this case centers on the question of which of a number of transactions resulting in the purchase by the importer is the proper transaction to examine for the purpose of establishing a value of the merchandise. The facts lend themselves to discussion in two sequences; that relating to transactions prior to April 1966 and that relating to transactions thereafter. Prior to April 1966, the merchandise was sold by the Japanese manufacturer, Onoda Chemical Industries Co. Ltd. (hereinafter referred to as Onoda) to Mitsui & Co. Ltd., a Japanese trading company (hereinafter referred to as Mitsui-Japan). Mitsui-Japan shipped the merchandise to its unincorporated branch at Seattle (hereinafter referred to as Mitsui-Seattle) which sold the merchandise to Inman & Co. After April 1966, the Mitsui entity in the United States was a subsidiary corporation (referred to herein as Mitsui-U.S.A.) so that the sequence of events was as follows: Onoda sold the merchandise to Mitsui-Japan which sold it to Mitsui-U.S.A. which in turn sold it to Inman & Co.

From the testimony of the appraising official, it is apparent that the price from which the calculation of export value was made was the sale price from Mitsui-Seattle or Mitsui-U.S.A. to Inman & Co. These appraisements were expressed on the official papers as an amount in United States dollars, varying according to the date, for a short ton, packed, less ocean freight and marine insurance, less import charges and transportation charges in the United States and less included duty in the amount of 10%.

The record in this case consists of the testimony of two witnesses, two affidavits and certain letters and contracts relevant to the transactions. I have excluded the papers attached to the affidavit which is exhibit 2, as being inadmissible in evidence.

The testimony of Mr. Stanley L. Grimes, assistant district director in charge of classification and value at the port of Portland, Oregon, established that the figure on which appraisement was based was the so-called "resale" price of Mitsui-Seattle to its United States purchaser.

Plaintiff's second witness was Mr. N. Hayashi, in charge of sales of the importation by Mitsui-Seattle during the relevant period. His testimony reveals the following sequence of events regarding the relationship which developed between Mitsui-Seattle and later Mitsui-U.S.A. and Inman & Co. Prior to August 1963, a different importer had been purchasing Tricaphos, but decided to end importing. Inman & Co., one of the prior importer's distributors, contacted Hayashi and expressed interest in handling future imports. After discussions of quantity requirements, Hayashi contacted Mitsui-Japan for a price. To this amount he then added estimated duty, costs of handling, customs clearance charges and $2.00 per short ton as a markup to cover profit and expenses of the Seattle office. This price was then conveyed to Inman & Co. The price quoted to Inman & Co. and the subsequent written contracts entered into with Inman & Co., were not conveyed to Mitsui-Japan, which simply delivered Tricaphos to Mitsui-Seattle and later Mitsui-U.S.A., as ordered. With regard to the sale of Tricaphos, Mitsui-Seattle and later Mitsui-U.S.A. acted without supervision or interference or restric-

in the United States are ordinarily liable.

If such or similar merchandise was not so sold or offered at the time of exportation of the merchandise undergoing appraisement, the United States value shall be determined, subject to the fore-going specifications of this subsection, from the price at which such or similar merchandise is so sold or offered at the earliest date after such time of exportation but before the expiration of ninety days after the importation of the merchandise undergoing appraisement.

tions from Mitsui-Japan. No part of the United States markup was transmitted to Mitsui-Japan nor did Mitsui-Japan pay money to Mitsui-U.S.A. or Mitsui-Seattle for such sales. In short, with the exception of inquiries regarding the price and capability of supplying the instant merchandise, the entire transaction was conducted either between Mistui-Seattle and the American purchaser or Mistui-U.S.A. and the American purchaser.

I will deal first with the sequence of events as it existed prior to the incorporation of Mitsui-Seattle. I am of the opinion that during the aforementioned period there was no export value for the merchandise in question. An export value was not generated in the sale from Onoda to Mitsui-Japan, nor in the transfer from Mitsui-Japan to Mitsui-Seattle nor in the sale from Mitsui-Seattle to Inman & Co.

■■ The first transaction does not establish export value because it was a sale in Japan which was not "for exportation to the United States," within the meaning of section 402(b) of the Tariff Act of 1930, as amended. The mere fact that said sale took place in Japan is not the disqualifying factor since it is entirely possible for an export value to arise from transactions within the foreign country. This may be the case when an American purchaser acts through a buying agent or when a manufacturer sells to a trading house in such a manner that the merchandise in question is irrevocably and undeniably, by reason of its nature and mode of handling, destined for export to the United States. (See for example, United States v. Getz Bros. & Co. et al., 55 CCPA 11, C.A.D. 927 (1967)). In that case, our appellate tribunal found substantial evidence in the record that "notwithstanding the absence of a specific restriction that the plywood be exported, there was an effective control which assured the mills or manufacturers that the plywood was being sold for exportation." The nature and extent of such "effective

control" appears to be far stronger in the situation in United States v. Getz Bros. & Co. et al., than in the situation herein. In the former case. there was evidence to indicate that the nature of the plywood and door skins prevented their sale in Japan and that in addition only the merchandise destined for export was subject to certain quality control. In the instant case, there is testimony that the merchandise was marked and numbered for the United States by Onoda. Such testimony is not comprehensive and as forceful as that in United States v. Getz Bros. & Co. et al., *supra*, and hence the proof does not, as it stands, support a view that the merchandise in question was completely and effectively destined for export when sold by Onoda to Mitsui-Japan.

■ The transfer of the merchandise in question from Mitsui-Japan to Mitsui-Seattle was not a sale since it was merely the movement of the goods from one portion to another of the same corporate entity. Such an action cannot, in any way, give rise to an export value within the meaning of the valuation statute.

■ The sales from Mitsui-Seattle to Inman & Co. did not give rise to an export value because, in my opinion, it was not a sale in the country of exportation. It was a sale taking place in the United States since the principal negotiations and the confirmation of the sales agreement took place in the United States. I view the inquiries of Mr. Hayashi, the head of Mitsui-Seattle, in querying Mitsui-Japan for a price and the availability of the merchandise, as being in the nature of informational inquiries and not indications that the power of confirmation existed elsewhere than in the Seattle branch. On this point, I consider the facts herein similar to those in United States v. Massce & Co.; Rechsteiner, Hirschfield & Co.; Landenburg Thalman & Co., 21 CCPA 54, T.D. 46379 (1933). In that case, the court spoke as follows at page 57 regarding the condi-

tions affecting the site of the sales transaction:

> We are of the opinion that there is substantial evidence in the record sustaining this conclusion of the court below. The fact appears to be that all offers for sale and all sales of merchandise such as or similar to the merchandise here involved were made in the United States and none were made in Switzerland. The mere fact that designs of merchandise were accepted in Switzerland before the contract made in the United States became complete does not constitute offers for sale in Switzerland. It appears from the record that no purchasers in the United States transmitted to Switzerland offers to buy merchandise such as is here involved, and no offers to sell such merchandise was made in Switzerland. It further appears that there was no contractual relationship entered into in Switzerland between the manufacturer and the purchasers in the United States. We think the fair import of the evidence is that the branch house of the manufacturer in New York sent to Switzerland orders for designs, and that the orders were finally accepted or rejected by the New York branch house. In other words, the acceptance of the design was, so far as the United States purchaser was concerned, made in New York and not in Switzerland, for apparently the manufacturer in Switzerland had no communication or relations with purchasers in the United States.

To summarize, I conclude that during the period when the Seattle branch of Mitsui-Japan sold the instant merchandise to Inman & Co., there was no export value for said merchandise. Export value was not generated by the sale from the manufacturer to Mitsui-Japan; it could not exist in the transfer from Mitsui-Japan to its Seattle branch and it did not arise from the sale in the United States which took place entirely between the Seattle branch and the purchaser.

I do not accept defendant's attempt to distinguish United States v. Massce & Co., *supra*, by stressing that the branch office therein carried merchandise in stock and made sales from such stock to anyone, thus evidently suggesting that the "presence" of the branch office be substantiated by such attributes of an ongoing business as keeping merchandise in stock. I believe this factor did not figure in the reasoning of the appellate court which relied heavily on the fact that the sales transaction involved took place in the United States and the purchasers in the United States "did not enter the market of Switzerland at all for the purchase of merchandise like that herein involved." Just as the court therein gave no weight to the fact that the designs involved were accepted in Switzerland before the contract was made in the United States, I give no weight to the even less portentious fact that inquiries regarding price and quantities were made by the Seattle branch of Mitsui-Japan.

■ The crucial fact in determining the location of the transaction, is the location of the power to make or accept an offer. In this case, I believe it existed in the Seattle branch and was exercised there.

■ In light of the above, export value is not the correct basis of appraisement for the merchandise involved in transactions prior to April 1966. The sole remaining question is whether plaintiff has successfully proved a United States value for the importations of that period in accordance with the requirements of section 402(c) of the Tariff Act of 1930, as amended.

Plaintiff's proof in this area may be treated in three sections. First, it takes the price at which Mitsui-Seattle sold to Inman & Co. as the price at which the merchandise was "freely sold * * * in the principal market of the United States * * *" as the starting point for deductions permitted by the statute. Second, it adopts the amounts in the appraisal for ocean freight, marine insur-

ance, entry costs and United States transportation costs and the duty of 10% as the deductions permitted by section 402(c) (2) and section 402(c) (3). Third, it relies on the testimony of Mr. Hayashi that he added $2.00 per short ton to the price to cover profit and general expenses as proof of the deduction for profit and general expenses permitted by section 402(c) (1).

Defendant attacks the first and third elements of proof, the former on the ground that the invoice price is not necessarily one at which the merchandise is "freely sold" and the latter on the ground that more particularity is required to establish the usual deduction for general expenses and profit.

Defendant's first objection is untenable in view of the fact that the invoice price is the one utilized by the appraiser and the one from which he deducted costs incurred between the port of exportation and delivery to Inman & Co. to arrive at an export value. Since that lesser amount was presumptively one at which the importations were freely sold, plaintiff may proceed to prove the deductions permitted from the original invoice.

■ I am of the opinion that plaintiff's proof of such deductions is satisfactory. The evidence of Mr. Hayashi was sufficient to establish a prima facie case that the merchandise involved was the only one of its class or kind imported. Consequently, proof regarding the actual amounts for profit and general expenses, should suffice in the absence of unusual circumstances. Judson Sheldon International Corporation v. United States, 54 Cust.Ct. 773, 780, A.R.D. 183 (1965).

■ I am further of the opinion that in such a situation, uncontradicted testimony as to the importer's actual "markup" suffices to supply proof as to the proper deduction for profit and general expenses. I find no support in the statute or case law for a mandatory or absolute requirement of greater detail. See, National Cardloading Corporation v.

United States, 65 Cust.Ct. 830, 834, A.R.D. 280, 319 F.Supp. 1291 (1970), appeal pending, wherein the court stated, "[w]e interpret the term 'addition * * * made' as virtually synonymous with what accountants and tradesmen call 'markup.'" [Footnote omitted.] In that case, it was not the general proof of markup which the court considered inadequate but rather plaintiff's failure to prove either that the markup was that usually made in importations of the same class or kind or that there were no other importations of the same class or kind. Since plaintiff herein has successfully proven the latter situation to be the case, proof of the actual additions should be considered proof of the usual additions, absent any countervailing conditions. Cf. United States v. Maier, 21 CCPA 41, 46, 47, 50, 51, 52, T.D. 46378 (1933); United States v. Jovita Perez, 36 CCPA 114, 118, 119, C.A.D. 407 (1949).

For the above reasons, I consider that plaintiff has successfully proven a United States value of those importations entered prior to the incorporation of Mitsui–Seattle.

■ After the incorporation, the legal consequences of the transactions discussed earlier changed and the transaction between Mitsui-Japan and Mitsui-U.S.A. became one which could authentically generate an export value. The very same qualities of independence possessed by Mitsui-Seattle; those factors which led me to place the situs of sales in the United States, when coupled with Mitsui-Seattle's assumption of corporate statute lead me to conclude that its purchases from Mitsui-Japan were indeed sales. See, Dorf International, Inc., et al. v. United States, 61 Cust.Ct. 604, A.R.D. 245, 291 F.Supp. 690 (1968).

■ It remains for plaintiff to show that these sales were at prices which fairly reflected market value, a requirement arising from the fact that Mitsui-U.S.A. was clearly a selected purchaser within the meaning of section 402(b)

and 402(f) of the Tariff Act of 1930, as amended.

■ Ordinarily, where the exporter is a manufacturer resort is had to other prices for export to the country of importation, to third countries or for home consumption in the country of exportation in order to determine whether the disputed price fairly reflects market value. United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964); Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, R.D. 11597 (1968), aff'd, 64 Cust.Ct. 860, A.R.D. 273, 313 F.Supp. 1016 (1970). Plaintiff has not taken this course and has relied instead on the fact that Mitsui-Japan sold the importations at a price which was at least 10% higher than the price it paid to the manufacturer. Plaintiff argues that this cricumstance should conculsively show that the price at which Mitsui-Japan sold the importations to Mitsui-U.S.A fairly reflected market value.

I do not agree that this is sufficient to show a fair reflection of market value. At this point, plaintiff's reasoning leaves the realm of proof and enters an area of inferences and speculation. The mere fact that Mitsui-Japan sold the merchandise at a price 10% higher than its purchase price does not mean that it thereby covered its expenses and realized a profit. Only in the latter event would the situation be analogous to that in which a manufacturer of unique articles proves them "freely sold" by the fact that its price covers costs, general expenses and a normal profit. See, e.g., J. L. Wood v. United States, 58 Cust.Ct. 682, R.D. 11292 (1967); cf. United States v. Acme Steel Company, 50 Cust. Ct. 529, 536–537, A.R.D. 152, 216 F. Supp. 448 (1963), aff'd, 51 CCPA 81, C.A.D. 841 (1964); United States v. John V. Carr & Son, Inc., 52 Cust.Ct. 599, A.R.D. 165 (1964), aff'd, John V. Carr & Son, Inc. v. United States, 52 CCPA 62, C.A.D. 860 (1965).

Absent specific proof that the price at which Mitsui-Japan sold the importations covered its costs and general expenses and generated a profit, I am unable to say that it fairly reflected market value. The affidavit of Mitsui-Japan's assistant manager in charge of the sale of imported merchandise contains only the prices at which the merchandise was sold and not the essential underlying facts as to whether this price covered costs, expenses and profit.

It matters not if the importation is a unique commodity, manufactured only by Onoda, exported only by Mitsui-Japan and purchased only by Mitsui-U.S. A. Wherever in that chain an export value is sought, it must be founded, at the very least, on sale at a price which is shown to specifically cover costs, expenses and allow a normal profit, not merely sale at a price higher than purchase price.

Nor am I willing to make an inference that because Mitsui-Seattle was able to make a profit on what was in effect an addition of less than 4% to its purchase price, the addition of approximately 10% to Mitsui-Japan's purchase price must have generated a profit.

Proof of fair reflection is an oblique method to begin with. Reducing it to mere proof that the exporter purchased the goods at a certain price and sold them at a higher price, is unsatisfactory. It is not self-evident that Mitsui-Japan must have covered its expenses and made a profit. There may be considerations which would warrant its foregoing a profit. Without specific and more detailed proof I cannot say that Mitsui-Japan's price fairly reflected market value.

■ For the above reasons I find that plaintiff has failed to prove the export value it claims for the merchandise imported after April 1966. Since export value is nevertheless the correct basis of appraisement, the value found by the appraising official must stand.

In conclusion, I make the following findings of fact:

1. The merchandise covered by these appeals for reappraisement is "Tricaphos" a product used as an ingredient in

animal feeds and was manufactured and exported from Japan during the period from July 28, 1964 through July 16, 1967.

2. The merchandise does not appear on the Final List of the Secretary of the Treasury, T.D. 54521.

3. The merchandise was entered at the invoiced c. i. f. unit prices less non-dutiable ocean freight and marine insurance.

4. The merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at various higher unit values as noted on the invoice papers and attachments.

5. In April 1966 the Seattle branch of Mitsui & Co. Ltd. of Japan became a corporation.

6. Prior to the incorporation of the Seattle branch the merchandise in question was manufactured by Onoda Chemical Industries Co. Ltd. of Japan, sold to Mitsui & Co. Ltd. imported by its branch in Seattle and sold by them to Inman & Co.

7. During that period there was no export value for the merchandise.

8. During that period the site of the purchase by Inman & Co. was the United States.

9. During that period the merchandise was freely sold or offered for sale to all purchasers at wholesale in the United States in the principal market of the United States for domestic consumption, in any quantity and in the ordinary course of trade, at the appraised values.

10. During that period the usual costs of transportation and insurance were those deducted by the appraising official on the papers attached to the entries, representing ocean freight, marine insurance, wharfage, brokerage charges and other entry costs and transportation in the United States.

11. During that period the imported merchandise was dutiable at the rate of 10% ad valorem.

12. During that period the addition for profit and general expenses usually made in connection with sales in the principal market of the United States for consumption of imported Tricaphos was $2.00 per short ton.

13. Subsequent to the incorporation of the Seattle branch it purchased the importations from Mitsui & Co. Ltd. of Japan.

14. During that period the merchandise was not sold for export by Mitsui & Co. Ltd. to all purchasers at wholesale.

I therefore reach the following conclusions of law:

1. The proper basis of appraisement for the merchandise covered by the appeals for reappraisement listed on the attached Schedule A is United States value as defined in section 402(c) of the Tariff Act of 1930, as amended.

2. Said value is the appraised value less $2.00 per short ton.

3. The proper basis of appraisement for the merchandise covered by the appeals for reappraisement set out on the attached Schedule B is export value as defined in section 402(b) of the Tariff Act of 1930, as amended.

4. Plaintiff has failed to prove export values other than the appraised values.

5. The correct values of the merchandise imported in the latter period are those found by the district director.

Judgment will be entered accordingly.