The UNITED STATES

v.

MITSUI & CO., LTD.

A.R.D. 315; Reappraisement No. R67/10864 and 16 others.

United States Customs Court, Second Division, Appellate Term.

June 19, 1973.

Harlington Wood, Jr., Asst. Atty. Gen., Patrick D. Gill, New York City, trial attorney, for appellant.

Barnes, Richardson & Colburn, New York City (Earl R. Lidstrom, New York City, of counsel), for appellee.

Before RAO, FORD and NEWMAN, JJ.

NEWMAN, Judge:

This is an application for review by the Government of the decision and judgment in Mitsui & Co., Ltd., Mitsui & Co. (USA), Inc. v. United States, 68 Cust.Ct. 266, R.D. 11767, 341 F.Supp. 1219

(1972), respecting 17 of 34 consolidated appeals for reappraisement, wherein the trial court upheld the United States values claimed by appellee.

All 34 appeals for reappraisement involved merchandise invoiced as "Tricaphos", an ingredient used in animal feed, exported from Japan between 1964 and 1967. The merchandise was manufactured in Japan by Onoda Chemical Industries Co., Ltd. (Onoda), and sold by Onoda to a Japanese trading company, Mitsui & Co., Ltd. (Mitsui-Japan). Prior to April 1966, Mitsui-Japan shipped the Tricaphos to appellee, its unincorporated branch in Seattle (Mitsui-Seattle), who sold the importations to its United States customer, Inman & Co. (Inman).

The 17 appeals for reappraisement (subject of this review) cover only the shipments from Mitsui-Japan to Mitsui-Seattle during the period of July 1964 through February 1966. Thereafter, in April 1966, Mitsui-Seattle was incorporated as a subsidiary of Mitsui-Japan, and called Mitsui & Co. (U.S.A.) (Mitsui-U.S.A.). The remaining 17 appeals for reappraisement (which are not the subject of this review) involved shipments to Mitsui-U.S.A.

The importations were appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)). These appraisements are expressed on the official papers as follows: an amount in U. S. dollars (which varies according to the date) per short ton, packed, less ocean freight and marine insurance (in amounts checked by the appraising officer on the papers), less import charges and transportation costs in the United States (in amounts checked by the appraising officer on a sheet attached to the papers and supplied by the custom house broker), less included duty in the amount of 10 percent.

Appellant claims that the appraisements are correct.

Appellee claims that there is no export value for the merchandise, and that United States value as defined in section 402(c) (19 U.S.C. § 1401a(c)) is the proper basis for appraisement. The United States values claimed are the appraised values, less $2.00 per short ton, which is asserted by appellee to cover an allowance for commissions under section 402(c)(1).

The parties have stipulated that the merchandise is not on the Final List of the Secretary of the Treasury, T.D. 54521 (R. 4).

## STATUTES INVOLVED

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(c) United States Value.—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

\*   \*   \*   \*   \*   \*

## THE RECORD

The record comprises the oral testimony of two witnesses, two affidavits and other documentary evidence submitted on behalf of appellee; and the official papers which were received in evidence as an unmarked exhibit (R.2). Appellee conceded that Mitsui-Seattle was a branch of the exporter (R.5). Appellant conceded that by written directive the Bureau of Customs required the importer to make a nonpurchase declaration on the special customs invoice in entries made prior to April 1966 (R.18–22).

Appellee called Stanley L. Grimes, assistant district director in charge of classification and value at the port of Portland, Oregon, who was the appraising official on the dates of entry. Mr. Grimes testified that his appraisements were derived from the so-called resale price of Mitsui-Seattle to its United States customer, Inman, by taking certain deductions for charges and expenses incurred in shipping the merchandise from Japan and importing it into the United States.

Appellee's other witness was N. Hayashi, who testified that he had been employed by Mitsui-U.S.A. for nearly thirteen years [1] and was in charge of "general merchandise and textiles"; that Tricaphos were among the lines for which he was responsible; and that he began buying Tricaphos from Mitsui-Japan in 1960.

Concerning the sequence of events in the relationship between Mitsui-Seattle and Inman, we adopt the trial court's succinct summary of Mr. Hayashi's testimony:

\*   \*   \*   Prior to August 1963, a different importer had been purchasing Tricaphos, but decided to end importing. Inman & Co., one of the prior importer's distributors, contacted Hayashi and expressed interest in handling future imports. After discussions of quantity requirements, Hayashi contacted Mitsui-Japan for a price. To this amount he then added estimated duty, costs of handling, customs clearance charges and $2.00 per short ton as a markup to cover profit and expenses of the Seattle office. This price was then conveyed to Inman & Co. The price quoted to Inman & Co. and the subsequent written contracts entered into with Inman & Co., were not conveyed to Mitsui-Japan, which simply delivered Tricaphos to Mitsui-Seattle and later Mitsui-U.S.A., as ordered. With regard to the sale of Tricaphos, Mitsui-Seattle and later Mitsui-U.S.A. acted without supervision or interference or restrictions from Mitsui-Japan. No part of the United States markup was transmitted to Mitsui-Japan nor did Mitsui-Japan pay money to Mitsui-U.S.A. or Mitsui-Seattle for such sales. In short, with the exception of inquiries regarding the price and capability of supplying the instant merchandise, the entire transaction was conducted either between Mitsui-Seattle and the American purchaser or Mitsui-U.S.A. and the American purchaser.

An affidavit executed by Toshihisa Arai dated September 11, 1969 is to the following effect: The affiant is the assistant manager of the fertilizer department of Mitsui-Japan. His duties include buying Tricaphos from the manufacturer, Onoda, and reselling such product. Mitsui-Japan sold Tricaphos (at certain contract prices set forth in the affidavit) to its branch in the United States during the period 1964 through April 1966. During such time, Mitsui-

---

1. Hayashi undoubtedly meant that he had been employed for thirteen years by Mit-

sui-Seattle and its successor, Mitsui-U.S.A.

Japan never received an offer to purchase Tricaphos from Inman, nor did Mitsui-Japan negotiate directly with, offer to sell to, or sell Tricaphos to Inman.

When Mitsui-Japan sold Tricaphos to its branch in the United States, Mitsui-Japan did not exercise any control over the price at which its branch could resell Tricaphos, or over the customers to whom its branch could sell. Mitsui-Seattle was not required to submit its contracts with or orders from customers to Mitsui-Japan before entering into such, contracts or accepting such orders; and the branch was not required to keep Mitsui-Japan advised of terms, prices, quotations, market conditions or inquiries from its prospective customers. The branch did not submit contracts or orders for Tricaphos from its customers to Mitsui-Japan; nor was Mitsui-Japan advised by its branch of terms, prices, quotations, market conditions or inquiries from prospective customers.

## DECISION OF TRIAL COURT .

So far as relevant to the issues raised in this review, the trial judge held that the transactions between Mitsui-Japan and Mitsui-Seattle were not "sales", since such transactions constituted merely "the movement of the goods from one portion to another of the same corporate entity. Such an action cannot, in any way, give rise to an export value within the meaning of the valuation statute". 68 Cust.Ct. at 270. Further, relying upon United States v. Massce & Co. et al., 21 CCPA 54, T.D. 46379 (1933), the trial court held that export value could not be predicated upon the sales to Inman (upon which sales the appraisements were based) because those sales were not made in Japan, but rather were made in the United States by Mitsui-Seattle.

After eliminating export value as a possible basis for appraisement (prior to Mitsui-Seattle's assumption of corporate status), the trial court then held that appellee had established its alternative claim for United States value.

## THE ISSUES

1. Did the trial court correctly hold that the appraised export values could not be predicated upon the sales to Inman?

2. Did the trial court correctly hold that appellee had established its alternative claim for United States value?

## EXPORT VALUE

It is, of course, fundamental that appellee had the burden of first rebutting the presumption of correctness attaching to the appraised export values, and then proving the United States values it claims. Minkap of California, Inc. v. United States, 55 CCPA 1, C.A.D. 926 (1967). Hence, it is appropriate initially to consider whether the trial court correctly held that export value was eliminated as a basis for appraisement prior to the incorporation of Mitsui-Seattle.

Appellant contends that the court below erred in that export value is predicable upon sales made by Mitsui-Japan *through* Mitsui-Seattle *to* Inman. Such contention is untenable. The record clearly shows that Mitsui-Seattle, not Mitsui-Japan, sold to Inman and fixed the prices at which the Tricaphos were sold. Moreover, Mitsui-Seattle acted with complete independence from Mitsui-Japan in selling Tricaphos to Inman. In point of fact, except for shipping the product to Mitsui-Seattle, Mitsui-Japan had nothing to do with the transactions concerning Inman. Consequently, we agree with the holding of the trial judge that:

The sales from Mitsui-Seattle to Inman & Co. did not give rise to an export value because, in my opinion, it was not a sale in the country of exportation. It was a sale taking place in the United States since the principal negotiations and the confirmation of the sales agreement took place in the United States. I view the inquiries of Mr. Hayashi, the head of Mitsui-Seattle, in querying Mitsui-Japan for a price and the availability

of the merchandise, as being in the nature of informational inquiries and not indications that the power of confirmation existed elsewhere than in the Seattle branch. On this point, I consider the facts herein similar to those in United States v. Massce & Co.; Rechsteiner, Hirschfield & Co.; Landenburg Thalman & Co., 21 CCPA 54, T.D. 46379 (1933). * * *

In *Massce*, the Swiss manufacturer's selling agency in New York (or its traveling salesmen) took orders from purchasers in the United States for wearing apparel, and delivery of the merchandise was made by the manufacturer to the selling agency or directly to the American purchasers. The appellate court held that the dutiable value of the merchandise was United States value rather than export value, noting that all offers for sale and all sales were made in the United States; that no purchasers in the United States transmitted their offers to buy to Switzerland; that no offers to sell the merchandise were made in Switzerland; that there was no contractual relationship entered into in Switzerland between the manufacturer and the purchasers in the United States; and that orders were finally accepted or rejected by the New York branch house.

Appellant attempts to distinguish *Massce* from the present case on the basis that Inman's orders to purchase Tricaphos were subject to acceptance by Mitsui-Japan.[2] However, the record does not establish that Inman's orders were subject to acceptance in Japan, but on the contrary, affirmatively establishes precisely the reverse.

Appellant stresses that before Mitsui-Seattle entered into any sales agreements with Inman, the importer first entered into agreements with Mitsui-Japan to obtain the merchandise. We think it apparent that no prudent seller would agree to sell a product that he does not have in his inventory or at least is assured of obtaining from his supplier before he is obliged to make delivery to his customer. In any event, whatever the reason for the particular sequence of agreements, such sequence does not establish that Inman's offers or orders were accepted or approved by Mitsui-Japan.

We have considered the other grounds urged by appellant to distinguish *Massce* and have concluded that they too are without merit. In sum, we are clear that the rationale of *Massce* precludes finding an export value upon the basis of sales to Inman, and accordingly, the appraisements made on such basis are erroneous.

### UNITED STATES VALUE

Turning to appellee's claimed values, we now consider the correctnesss of the trial court's holding that "plaintiff [appellee] has successfully proven a United States value of those importations entered prior to the incorporation of Mitsui-Seattle".

The only element of United States value that appellant now disputes is an allowance by the trial court of $2.00 per short ton for profit and general expenses pursuant to section 402(c)(1). On this aspect of the case, the trial judge held that the "uncontradicted testimony as to the importer's actual 'markup' suffices to supply proof as to the proper deduction for profit and general expenses", relying upon this Appellate Term's de-

---

2. Undoubtedly *Massce* would not be applicable here if Mitsui-Seattle had sent Inman's orders to Japan for acceptance. In *Massce*, the appellate court pointed out in dictum that "if offers by purchasers had been transmitted to Switzerland and there accepted by the Swiss manufacturer, we should not hesitate, under the facts of this case, to hold that export value was established * * *." 21 CCPA at 59. See also V. I. Jewelry Manuf. Corp. v. United States, 63 Cust.Ct. 723, 735, V.D. 156 (1969); Dorf International, Inc., et al. v. United States, 61 Cust.Ct. 604, 612–13, A.R.D. 245, 291 F.Supp. 690 (1968); New England Foil Corp. v. United States, 8 Cust.Ct. 630, 635–36, R.D. 5591 (1942), aff'd sub nom., United States v. New England Foil Corp., 10 Cust.Ct. 596, 597, R.D. 5856 (1943); United States v. F. C. Gerlach & Co. et al., 7 Cust.Ct. 494, 501–502, R.D. 5443 (1941).

cision in *National Carloading Corporation v. United States*, 65 Cust.Ct. 830, A.R.D. 280, 319 F.Supp. 1291 (1970).

Appellant contends that reversal of the trial court's judgment is required in light of the holding of the Court of Customs and Patent Appeals in *National Carloading Corp. v. United States*, 60 CCPA ——, C.A.D. 1080, 469 F.2d 1398 (1972), aff'g, 65 Cust.Ct. 830, A.R.D. 280 (1970), which was rendered subsequent to the decision of the trial judge in this case. In view of the pivotal relationship of *National Carloading* to the present litigation, the opinions in that case of the trial court, the Appellate Term and the Court of Customs and Patent Appeals are summarized.

In *National Carloading*, the sole issue was whether the importer had established the proper allowance for profit and general expenses under section 402(c)(1) on certain unfinished mica condenser sections. Although the importer was engaged in selling product lines other than unfinished mica condenser sections, the importer did not attempt to allocate the profit and general expenses included in its "gross markup" to any particular product. The importer's president explained that he made no allocation, "[b]ecause our business is a small operation and we handle different items. The same people do different types of work, [and] we have no departmentalized sections. In short, there is no possible way that I can see to assign a given expense to a given item".

The trial court held that plaintiff's proof failed to establish the proper allowance for profit and general expenses for the following reasons (63 Cust.Ct. 594, at 598–600):

Though plaintiff has established without rebuttal that it was the only importer of unfinished mica condenser sections, it was not thereby relieved of the obligation of showing what were the *actual profits and general expenses incurred in sales* of merchandise of the same class or kind. It was therefore incumbent upon plaintiff to provide this court with evidence of what were *the elements of the general expenses and profit in its sales of the condenser sections.* * * * [Emphasis added.]

* * * * * *

Especially in view of the testimony that the selling price of unfinished mica condenser sections was calculated upon an approximate formula, which did not take into consideration actual direct expenses, it does not appear that the gross markup figures shown are meaningful.

*Neither is there any evidence of the general expenses which plaintiff asserts make up part of the figure for "markup".* Without a showing of what general expenses were taken into consideration where the cost of general expenses and the amount of profit were computed, how is the court to determine whether or not *proper elements of general expenses* have been included. Plaintiff's *ipse dixit*, that X dollars represents the total of general expenses and profit is a conclusion without supporting evidentiary facts. See and compare Brooks Paper Company v. United States, *supra* [40 CCPA 38, C.A.D. 495 (1952)]. [Emphasis added.]

* * * * * *

While this court recognizes the difficulty which plaintiff has encountered in meeting the requirements of this section, the lack of proof of general expenses *attributable to the mica condenser sections* must therefore cause this appeal to fail. The problem that plaintiff has incurred in maintaining proper records of general expenses, while understandable, can have no bearing on the requirements of the statute. [Emphasis added.]

On application for review, this Division Appellate Term) affirmed the judgment of the single judge (65 Cust.Ct. 830, A.R.D. 280, 319 F.Supp. 1291 (1970)). We held that the phrase in section 402(c)(1), "addition [made] for profit and general expenses" is "virtually synonymous with what accountants

and tradesmen call 'markup' ". Hence, we determined that appellant was not required to show the actual profit and general expenses *"incurred"*. However, the judgment of the trial court sustaining the appraised values was affirmed by us on the predicate that the importer's proof was inadequate to establish that the unfinished mica condenser sections constituted a "class or kind" of merchandise, rather than a particular product. Consequently, the actual markup of the sole importer of unfinished mica condenser sections was not accepted as representing the addition for profit and general expenses actually made in connection with sales of "merchandise of the same class or kind", within the purview of section 402(c)(1) of the Tariff Act of 1930, as amended.

On appeal, the Court of Customs and Patent Appeals affirmed, but expressed agreement with the rationale of the trial judge and disagreement with our approach. The appellate court observed:

> In the present case, it appears that Intercontinental [the ultimate consignee] sells a variety of goods. There is no indication that in fixing the markup for the unfinished mica condensers the importer *isolated and included only the general expenses, and, similarly, profit, attributable to the sale of this class of goods. * * ** [Emphasis added.]

And further:

> * * * Appellant has *not* proved that the asserted markup is the sum of general expenses *incurred in the sale of unfinished mica condensers* and profit added *in connection with the sale of unfinished mica condensers.* * * * [Emphasis by CCPA.]

■ We agree with appellant's contention that the judgment below must be reversed in light of the appellate court's decision in *National Carloading.* The sole "proof" offered by appellee to sup-

port the $2.00 allowance was the testimony of witness Hayashi (R. 49).

Q. Now, during your previous testimony, Mr. Hayashi, you stated that when you set a price, or when you made a price, for Tricaphos to Inman Company, you added as your markup two dollars to the figure that you had received from Mitsui, plus charges that you estimated.

A. Yes.

Q. Was there any reason why you selected two dollars?

&ast;   *   *   *   *   *

A. *There was no particular reason. I just felt that two dollars would be sufficient to cover our profit and whatever expenses are involved in this business.* [Emphasis added.]

The above testimony fails to sustain appellee's burden of proof under section 402(c)(1). As in *National Carloading,* there is no evidence in this case of the *actual* profit and general expenses "incurred" in sales of Tricaphos. Nor is there any evidence of the "elements" of general expenses covered by the $2.00 figure. Thus, as stated by the trial judge in *National Carloading,* 63 Cust. Ct. at page 600: "Plaintiff's *ipse dixit* that [two] dollars represents the total of general expenses and profit is a conclusion without supporting evidentiary facts". And to paraphrase our appellate court in *National Carloading,* "[t]here is no indication that in fixing the markup for the [Tricaphos] the importer [Mitsui-Seattle] isolated and included only the general expenses, and, similarly, profit, attributable to the sale of this class of goods".[3]

We must stress that the decision by the trial court in this case was rendered before the appellate court's decision in *National Carloading*; and as previously noted, the trial court relied upon our rationale in *National Carloading* in hold-

---

3. Hayashi was not only in charge of buying and selling Tricaphos, but he was also in charge of "general merchandise and tex- tiles". (R. 29). Thus, the importer's business included several product lines, as was the situation in *National Carloading.*

ing that the testimony of Hayashi "as to the importer's actual 'markup' suffices to supply proof as to the proper deduction for profit and general expenses". Understandably, therefore, the trial court erred concerning that aspect of the case.

Appellee conceded on the oral argument that if the $2.00 markup represented "profit" and "general expenses" within the purview of section 402(c)(1), the appellate court's holding in *National Carloading* is indistinguishable (Tr.Arg. 31). However, appellee contends that Mitsui-Seattle's $2.00 markup constitutes a "commission"; and on that basis *National Carloading* is distinguishable from the present case. Such contention is bottomed upon the trial court's finding that the transaction between Mitsui-Japan and Mitsui-Seattle was not a "sale" and that in entering the merchandise the Government required appelleee to make a nonpurchase declaration.

■ Appellee's contention that the $2.00 markup was a "commission" is entirely without merit. If as agreed by both parties and found by the trial court, the transaction between Mitsui-Japan and Mitsui-Seattle was not a "sale", but was merely the movement of the goods from one portion to another of the same corporate entity, then obviously such corporate entity could not pay itself a "commission" on sales to Inman. Additionally, appellee's declaration of non-purchase is consistent with appellee's concession that it was a branch of the exporter, and is also consistent with the finding of the trial court that the merchandise was merely transferred from one portion to another of the same corporate entity (Mitsui & Co., Ltd.).

■ In sum, appellee has failed to establish that its markup of $2.00 represents either a commission or the proper allowance for profit and general expenses under section 402(c)(1), and thus appellee has not proved its claimed United States values. Consequently, the ap-praised values, although erroneous, stand as the dutiable values of the merchandise. Ellis Silver Co., Inc. v. United States, 63 Cust.Ct. 647, R.D. 11688 (1969), aff'd, 67 Cust.Ct. 564, A.R.D. 293 (1971), aff'd, 60 CCPA ——, C.A.D. 1100 (1973). Accordingly, the judgment below sustaining the claimed United States values of the merchandise is reversed.

## FINDINGS OF FACT

1. The importations consist of a product known as "Tricaphos", exported by Mitsui-Japan during the period from July 1964 to February 1966, and entered at Portland, Oregon.

2. The merchandise was shipped to Mitsui-Seattle, the exporter's branch office in the United States. The transactions between Mitsui-Japan and Mitsui-Seattle were not sales, but merely the transfer of goods from one portion to another of the same corporate entity.

3. The merchandise does not appear on the Final List of the Secretary of the Treasury, T.D. 54521.

4. The merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at various values indicated on the official papers.

5. The merchandise was sold by Mitsui-Seattle to Inman.

6. The appraised values were predicated upon the sales to Inman.

7. No offers or orders by Inman for Tricaphos were sent by Mitsui-Seattle to Mitsui-Japan for acceptance or approval.

8. Prices quoted by Mitsui-Seattle to Inman and the subsequent written contracts between them were not conveyed to Mitsui-Japan.

9. Mitsui-Seattle acted without supervision, interference, or restriction by Mitsui-Japan in the sale of Tricaphos to Inman.

10. Appellee included a markup of $2.00 in the sale price of the Tricaphos

to Inman to cover a profit and the expenses of its business.

11. The $2.00 markup did not represent a commission.

12. Tricaphos was only one of several product lines sold by appellee.

13. Appellee offered no evidence to show the actual profit and general expenses "incurred" in sales of Tricaphos.

14. Appellee offered no evidence to show what expenses were covered by its "markup".

15. Appellee offered no evidence to prove that in fixing a markup of $2.00 for the Tricaphos it isolated and included only the general expenses, and, similarly, profit, attributable to the sale of that class of goods.

## CONCLUSIONS OF LAW

1. The appraisements in the 17 appeals for reappraisement, covered by this review, are erroneous since they were predicated upon sales made in the United States.

2. Appellee failed to establish that its markup of $2.00 represents either a commission or the proper allowance for profit and general expenses under section 402(c)(1).

3. Since appellee failed to establish its claimed United States values, the appraised values stand as the dutiable values.

The judgment of the trial court is reversed. A judgment herein will be entered accordingly.